## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                                Bky No. 09-48229-RJK

     E151 Minnesota, Inc.,

          Debtor.

Timothy D. Moratzka, Trustee for the Bankruptcy              Adv. No._____
Estate of E151 Minnesota, Inc.,
f/k/a Snyder's Drug Stores, Inc.

          Plaintiff

   v.

Snyder's Drug Stores (2009) Inc.;
Katz Funding (Minnesota), Inc.;
Katz Funding (US), Inc.

          Defendants

## ADVERSARY COMPLAINT TO AVOID FRAUDULENT TRANSFERS BY DEBTOR AND RELATED CLAIMS FOR RELIEF

Plaintiff, Timothy D. Moratzka, Chapter 7 Trustee ("Trustee") for the Bankruptcy Estate

(the "Estate") of E151 Minnesota, Inc., f/k/a Snyder's Drug Stores, Inc. (the "Debtor" or

"Snyder's"), by his undersigned attorneys, states and alleges as follows:

### INTRODUCTION

1.      Trustee seeks to unravel and avoid a series of transactions designed to manipulate

the out-of-court liquidation of Snyder's Drug Stores.  Through such devices, an insider creditor

improperly recovered over $30 million from Debtor's assets, while millions of dollars of

unsecured claims remain unpaid entirely.   The Minnesota Uniform Fraudulent Transfer Act

("MUFTA" or "MINN. STAT. § 513.--") prohibits the transfer of assets to pay antecedent debt

1

owed to an insider at a time when such insider has reasonable cause to believe the debtor is insolvent. Attempts to circumvent such liability as described below violate additional fraudulent transfer provisions under MUFTA and Section 548 of the Bankruptcy Code (the "Code" or "11 U.S.C. ---").

2.      Defendant Katz Funding (Minnesota), Inc. ("Katz Funding") was an insider of the Debtor, by virtue of their common controlling director, Daryl Katz. Katz Funding held substantial claims against the Debtor, and all parties knew by late 2008 that the Debtor had no long-term financial viability. In 2008, the CIT Group/Business Credit, Inc. ("CIT"), Debtor's senior non-insider creditor, refused to advance more funds and the Debtor decided to liquidate its assets to pay the CIT claim. Prior to this liquidation, the Debtor transferred a substantial amount of assets to Defendant Snyder's Drug Stores (2009) Inc. ("New Snyder's"), a successor entity. In the process, Debtor sought to put those assets out-of-reach for a substantial portion of its unsecured creditors.

3.      Debtor received no cash consideration for the transfer of assets to New Snyder's. New Snyder's assumed and guarantied repayment of certain claims against the Debtor, but those assumed claims were almost entirely held by Katz-related entities. New Snyder's guarantied Katz Funding's claim against the Debtor, thereby preserving Katz Funding's ability to satisfy its insider claim against the Debtor from the transferred assets. The debt assumption does not qualify as reasonably equivalent value under MUFTA or the Code.

4.      With the Debtor receiving no real value in return for the transfer of its assets, it had no alternative but to liquidate its remaining assets. That, however, was the plan all along. The remaining assets once sold to a number of third-parties yielded proceeds which were just sufficient to satisfy the CIT claim. Debtor sold its remaining assets to companies who operated

2

pharmacies, such as Walgreen's, Lunds, and Target.  Katz then changed the Debtor's name to E151 Minnesota, Inc.

5.      The Debtor's transfer of assets to New Snyder's lacked a *bona fide* business purpose, and was not accompanied by any substantial work-out strategy.  Without significant new capital or financing to transform its drug store enterprise, New Snyder's simply continued on in liquidation mode.  In less than a year, Katz commenced the sale of New Snyder's assets, and paid nearly all of the proceeds towards Katz Funding's claim against the Debtor.  New Snyder's was simply a vehicle for Katz Funding's attempt to pay itself in Snyder's overall liquidation in violation of MUFTA and the Code.  To prevent the subversion of MUFTA and the Code, this Court must avoid the transfer, and impose liability against the Defendants.

6.      Katz Funding has filed a secured claim against the Estate totaling approximately $41 million, although records now show the claim to have an accrued value no more than approximately $10 million.   Katz Funding failed to re-file a financing statement after the Debtor's name change, which cut off its perfected security interest in the Debtor's assets as of August 6, 2009.  Further, most of the Estate's assets are proceeds of real property leases and commercial tort claims, assets which Katz Funding had no security interest against in the first instance.  Trustee exercises his strong-arm powers to confirm Katz Funding's claim is unsecured.

7.      Trustee further seeks to subordinate or eliminate Katz Funding's unsecured claim in its entirety, due to the inequitable conduct by Katz Funding described herein.

## STATEMENT OF JURISDICTION AND VENUE

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).  All matters under 28 U.S.C. § 1334 and 28 U.S.C. § 157(a) have been referred to this Court by operation of Local Rule 1070-1, adopted pursuant to the Order

Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges by the District Court on July 27, 1984.

9.      This adversary proceeding under Rule 7001 of the Federal Rules of Bankruptcy Procedure relates to the bankruptcy case <u>In re E151 Minnesota, Inc.,</u> Bky. No. 09-48229.   The case commenced by an involuntary petition filed on December 3, 2009.  The Court entered an Order for Relief under Chapter 7 on December 29, 2009.   The case is now pending in this Court.

10.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (H), (K), and (O).

11.      Venue over this adversary proceeding is proper pursuant to 28 U.S.C. § 1409.

## PARTIES AND INSIDER STATUS

12.      Plaintiff, Timothy D. Moratzka, is the duly appointed Trustee in the bankruptcy case of the above-captioned Debtor.  Trustee has standing under 11 U.S.C. §§ 544 (a), 544(b)(1), 548, 549, 510, and 105 to bring the causes of action asserted herein.

13.      The Debtor is a Minnesota corporation.   The Debtor is formerly known as Snyder's Drug Stores, Inc., which had been in existence since the 1950s.  Debtor changed its corporate name on April 6, 2009 to E151 Minnesota, Inc.

14.      Defendant New Snyder's is a Minnesota domestic corporation with a registered agent of CT Corporation System, Inc., located at 100 South Fifth Street, #1075, Minneapolis, MN 55402.

15.      Defendant Katz Funding is a Minnesota domestic corporation with a registered agent of Neal Wahlmann and a registered address of 50 South Sixth Street, #1500, Minneapolis, MN 55402.   On or about July 12, 2010, Katz Funding filed a proof of claim against the Estate in which it asserts a secured claim in the amount of $41,874,975.62.  As noted below in Count IX, Trustee seeks to avoid any lien Katz Funding claims against the property of the Estate.

Additionally, in Counts X and XI, Trustee seeks to equitably subordinate the claims of Katz Funding or re-characterize such claims as equity.

16.     Katz Funding is a statutory insider of both the Debtor and New Snyder's under MUFTA and the Code.  At all relevant times, Daryl Katz was the sole Director of the Debtor and New Snyder's, as well as the sole Directors, and Chairman, President, Secretary, and Treasurer of Katz Funding.  Daryl Katz was in control at all times of all three companies, and owned, directly or indirectly, at least a 20 percent ownership interest in all three companies.

17.     At all relevant times, Katz Funding was also an "insider of an affiliate" of the Debtor, and therefore was an insider of the Debtor under MINN. STAT. § 513.41(7)(iv) and 11 U.S.C. § 101(31)(E).   On information and belief, Daryl Katz is the majority owner and controlling party of Katz Holdings (Minnesota), Inc. ("Katz Holdings").  Katz Holdings in turn was the 100% owner of Snyder's Holdings, Inc.  Snyder's Holdings in turn was the 100% owner of the Debtor.  Katz was therefore an affiliate of the Debtor, as the term "affiliate" is defined under MINN. STAT. § 513.41(1) and 11 U.S.C. § 101(2).  Katz Funding, as a company of which Daryl Katz is the Chairman, President, Secretary, and Treasurer, is an insider of Daryl Katz, and by operation of statute is an insider of an affiliate to the Debtor.

18.     At all relevant times, Katz Funding was also an "insider of an affiliate" of New Snyder's, and therefore was an insider of New Snyder's under MINN. STAT. § 513.41(7)(iv) and 11 U.S.C. § 101(31)(E).   On information and belief, Katz Holdings was the 100% owner of Snyder's Holdings (2009) Inc.  Snyder's Holdings (2009) in turn was the 100% owner of New Snyder's.  Katz was therefore an affiliate of New Snyder's, as the term "affiliate" is defined under MINN. STAT. § 513.41(1) and 11 U.S.C. § 101(2).  Katz Funding, as a company of which

Daryl Katz is the Chairman, President, Secretary, and Treasurer, is an insider of Daryl Katz, and by operation of statute is an insider of an affiliate to New Snyder's.

19.     Katz Funding is also a non-statutory insider of the Debtor and New Snyder's, by virtue of their mutually-controlling Director and owner, Daryl Katz.

20.     For all the same reasons noted above, the Debtor and New Snyder's are also insiders.

21.     Katz Funding (US), Inc. is named as a party because in 2010 it initially received proceeds of the Transferred Assets (as defined below) on behalf of Katz Funding.   On information and belief, Katz Funding (US) was a mere conduit in remitting proceeds of the Transferred Assets to Katz Funding.   Should discovery reveal that Katz Funding (US) had sufficient dominion and control over disbursements it simply remitted to Katz Funding, Trustee alleges that Katz Funding (US) would be liable for return or repayment of the Transferred Assets pursuant to 11 U.S.C. § 550(a), consistent with Counts VII and VIII set forth below against Katz Funding and New Snyder's.

**KATZ'S ACQUISITION OF SNYDER'S AND THE 2003-2004 BANKRUPTCY**

22.     Snyder's Drug Stores commenced operations in the 1950s and by the late 1990s had grown into the largest drug store retailer in the Midwest.

23.     Daryl Katz is owner of one of the largest chains of drugstores in North America, with total holdings in recent years of approximately 1,800 stores.   His operations are primarily based in Canada and Katz resides in Edmonton, Alberta.

24.     In 1999, Katz Enterprises (Minnesota), Inc. ("Katz Enterprises") purchased Snyder's Drug Stores, Inc. ("Snyder's") to expand Katz's pharmacy holdings into the United

States.  Under Katz Enterprises, Snyder's operated approximately 152 pharmacies throughout the northern United States, from Montana to New York.

25.     Snyder's filed Chapter 11 bankruptcy in 2003.  At the time, Snyder's term lenders were The CIT Group/Business Credit, Inc. ("CIT") (as the first-priority lender) for approximately $130 million, and McKesson Corporation ("McKesson") (as the second-priority lender) for approximately $100 million.   Katz Enterprises Holdings, Inc., held an equity interest or subordinated debt claim of approximately $40 million.

26.     Under the bankruptcy plan confirmed in the Chapter 11 case, Katz Holdings acquired Snyder's and assumed the $40 million Katz-related claims as equity or subordinated debt.  Katz Holdings was to contribute up to an additional $20 million, which would be treated going forward as subordinated debt.  Katz Holdings also received a note from Snyder's for a subordinated debt claim of $40.5 million.   Daryl Katz remained the sole director of Snyder's board.  The plan assumed the management contract of Katz Holdings under which Snyder's lenders consented to a management fee payable to Katz Holdings of no greater than $50,000 per month.

27.     The confirmed plan maintained Snyder's basic debt structure, but reduced the amounts owed both through pay down from new capital and through conversion of some debt to equity.   Snyder's paid down the CIT debt, and reaffirmed a lending commitment of approximately $60 million.  CIT sold a participation of roughly $25 million of its lending commitment to Bank of America.  In 2006, Katz Funding guaranteed repayment of a portion of Snyder's obligations under the CIT credit facility.  On information and belief, the amount of the Katz Funding guaranty was $5 million.

28.     Snyder's reaffirmed approximately $40 million of the McKesson debt and granted McKesson a warrant of up to 12.5%.  Katz Holdings and McKesson also entered into a separate participation agreement dated April 21, 2004, under which Katz Holdings would purchase portions of the McKesson loan on a schedule going forward.  The parties anticipated that Katz Holdings would purchase the entire balance of the debt by 2006.  Katz Holdings did not make the balloon payments required in 2006, but reaffirmed the participation agreement and modified the payment schedule at that time.

## CONTINUING FINANCIAL DISTRESS OF SNYDER'S AND THE LIQUIDITY PLAN

29.     By 2007, Snyder's again found itself in financial duress, which led Katz Funding to acquire Bank of America's portion of the CIT credit facility for a position of approximately $21 million.  In exchange for its commitment, CIT released Katz Funding from its prior guaranty.  CIT and Katz Funding thereafter entered into an Amended and Restated Loan Agreement with Snyder's under which CIT committed to lend $33 million and Katz Funding committed to lend $27 million.  Through subsequent modifications, CIT required its commitment to be reduced throughout 2008 via corresponding increases to Katz Funding's commitment.  By the beginning of 2009, CIT's commitment had been reduced to $20 million, while Katz Funding's commitment had increased to approximately $38 million.

30.     Snyder's continued to struggle throughout 2008, and by mid-2008 CIT indicated it would not advance further funds.  This led to the formulation of a work-out strategy, referred to internally as the "Liquidity Plan."  One goal of such plan was to liquidate assets to satisfy the claims of CIT's portion of the CIT credit facility.

31.     Snyder's had more than sufficient assets to liquidate CIT's portion of the CIT credit, and continue operating (at least for the short-term) certain stores subject to the remaining

term debt, which at that time would have been held mostly by Katz-related entities.  For instance, Katz Funding held the remainder of the CIT credit facility, and Katz Holdings held most of the McKesson claim, as well as all of the subordinated debt arising from the prior bankruptcy plan.

32.     Nonetheless, the Liquidity Plan first required transferring the purportedly better performing Snyder's stores to New Snyder's, a new entity created to execute the Liquidity Plan. The motivation was to remove those assets from the reach of Snyder's unsecured creditors, and facilitate the future payment of Katz Funding's portion of the CIT credit facility to the detriment of those unsecured claims in violation of MUFTA and the Code.

## IMPLEMENTATION OF THE LIQUIDITY PLAN AND THE TRANSFER OF ASSETS

33.     Pursuant to that certain Asset Purchase Agreement dated January 31, 2009, the transfer of the purportedly well-performing stores and related transactions closed on or about January 31, 2009 (the "Transfer"), with New Snyder's acquiring the following 26 stores:

| Store ID Number | Store Location |
| --- | --- |
| 05 | 720 Wildwood Road, Mahtomedi, MN 55115 |
| 07 | US Highway 71, PO Box 280, Menahga, MN 56464 |
| 08 | 101 North Main, Park Rapids, MN 56470 |
| 10 | 2083 Ford Parkway, St. Paul, MN 55116 |
| 12 | 2705 Winnetka Avenue, New Hope, MN 55427 |
| 15 | 1121 Larpenteur Avenue, St. Paul, MN 55113 |
| 24 | 400 Main Street, Cold Spring, MN 56320 |
| 25 | 2380 Shadywood Road, Orono, MN 55391 |
| 28 | 4600 Nicollet Avenue South, Minneapolis, MN 55409 |
| 32 | 120 West Third Street, Monticello, MN 55362 |
| 34 | 7105 Cedar Lake Road, St. Louis Park, MN 55426 |
| 39 | 1865 Wayzata Boulevard, Long Lake, MN 55356 |
| 40 | 309 North Faxon Road, Norwood, MN 55368 |
| 42 | 750 Main Street, Suite 103-104, Mendota Heights, MN 55118 |
| 44 | 2525 County Road #10, Mounds View, MN 55112 |
| 50 | 602 South Front Street, Mankato, MN 56001 |
| 56 | 3235 Chaska Boulevard, Chaska, MN 55318 |
| 59 | 1425 State Highway 101 North, Plymouth, MN 55447 |
| 60 | 5101 Gateway Street Southeast, Prior Lake, MN 55372 |
| 62 | 641 Market Place Drive, Waconia, MN 55387 |
| 73 | 800 White Bear Avenue, St. Paul, MN 55106 |

| 75 | 14617 59th Street North, Stillwater, MN 55082 |
| 77 | 2120 Silver Lake Road, New Brighton, MN 55112 |
| 81 | 1037 Highway 96, Shoreview, MN 55126 |
| 88 | 1750 Weir Drive, Woodbury, MN 55125 |
| 90 | 1260 East Fourth Avenue, Shakopee, MN 55379 |

including, but not limited to, a distribution center located at 2950 Lexington Avenue, Eagan, MN, all the Debtor's intellectual property, computers, sale and accounting systems, cash and receivables, deposits and prepaid expenses, permits and licenses; and, with respect to each store and the distribution center, the remaining personal property and equipment, inventories, contracts, and real property rights (the "Transferred Assets").

34.      The consideration paid by New Snyder's for the Transfer consisted of assuming the debts of the McKesson second-position claim (which by that time, on information and belief, had been largely assumed or paid by Katz Holdings) and the third-position Katz Holdings subordinated claim.  While New Snyder's did in fact assume the McKesson and Katz Holdings debt, McKesson expressly did not release its claims against the Debtor.   CIT, for itself and as agent for Katz Funding, also did not release its claims against the Debtor under the CIT credit facility, but New Snyder's guaranteed payment of the CIT credit facility.

35.      Prior to the Transfer, the Debtor and New Snyder's Board of Directors received a consultant's opinion stating that the proposed debt assumption provided fair value and consideration to the Debtor in exchange for the Transfer.  The opinion was limited in several respects.  It did not cite any specific case law for its conclusions, make any findings as to liquidation or going concern values of the Debtor, or render an appraisal of the Transferred Assets.  Nor did the opinion consider "the solvency, creditworthiness, or fair value of Seller or Buyer or any other participant in the Transaction under any applicable laws relating to bankruptcy, insolvency, fraudulent conveyance or similar matters."

36.     The Debtor did not receive reasonably equivalent value in exchange for the Transferred Assets.  Nearly all of the claims assumed by New Snyder's were held by insiders, or would be paid to insiders.  None of the third-party creditors of the Debtor released any claims against the Debtor as a result of the Transfer.  As a result, the consideration received by the Debtor was worthless.

37.     Shortly prior to the Transfer, the Debtor listed its assets to be worth approximately $51,740,278 and estimated its liabilities at $196,069,001.  Shortly following the Transfers, the Debtor listed its assets to be worth approximately $13,949,487 and estimated its liabilities at $75,306,238.

38.     Shortly after the Transfer, New Snyder's listed its assets to be worth approximately $34,065,499 and estimated its liabilities at $119,163,970.

39.     The Transfer was not a good faith attempt to restructure the ailing Debtor but rather an artful attempt to avoid paying the Debtor's unsecured claims, and to manipulate the liquidation of assets to eventually pay the claims of Katz Funding, an insider creditor, with the proceeds of the Transferred Assets.

### DEBTOR LIQUIDATES ITS REMAINING ASSETS AND CHANGES ITS NAME

40.     After the Transfer, the Debtor liquidated its remaining stores, which involved selling five stores as a going concern, and closing the remaining 23 stores.  With respect to the closed locations, the Debtor sold the remaining inventory and prescriptions to various buyers including Lund Food Holdings, Target, Super Valu, Walgreen's and Wal-Mart.  The Debtor paid the liquidation proceeds totaling approximately $17 million to reduce CIT's portion of the CIT facility.  Additional funds from wind-up operations allowed the Debtor to pay the CIT debt in full by March, 2009.

41.    On April 6, 2009, the Debtor changed its name to E151 Minnesota, Inc.  None of the creditors of the Debtor filed amended financing statements with the Minnesota Secretary of State's Office to reflect the Debtor's name change.

## NEW SNYDER'S AS SUCCESSOR ENTITY TO SNYDER'S

42.    New Snyder's remained controlled by Daryl Katz, as sole board member.  Other than assuming and agreeing to pay existing debt, it does not appear that New Snyder's entered into any new credit facilities for the long-term operation of its business.  On information and belief, Katz Funding refused to extend or increase credit to New Snyder's.  There is no indication that any substantial capital was invested into New Snyder's other than the Transferred Assets. There is no indication that New Snyder's pursued any significant management, financial, or strategic changes from the Debtor's previous operations.

43.    In virtually all respects, New Snyder's carried on the business of the Debtor after the Transfer.  With respect to the Transferred Assets, New Snyder's continued to operate the same stores, at the same locations, using the same employees and overhead mechanisms.

44.    The Transfer was a means for New Snyder's to continue using the Debtor's assets (if even for a short period) without paying a number of the Debtor's obligations.

45.    New Snyder's operated for approximately another year, but continued to lose money as an entity.  Store-by-store financial reports show that most stores operated by New Snyder's were unprofitable, or earned only marginal profits.

## LIQUIDATION OF NEW SNYDER'S AND POST-PETITION TRANSFERS

46.    In early 2010, New Snyder's liquidated its remaining assets, and sold its remaining prescriptions and inventory, primarily to Walgreen's.  The proceeds generated from these sales were paid on behalf of New Snyder's to Katz Funding (US), Inc.  On information and

belief, such proceeds were quickly remitted to Katz Funding, which applied the proceeds to reduce its portion of the CIT credit facility, pursuant to New Snyder's guaranty of that debt.

47.     Specifically, payments made for the benefit of New Snyder's in exchange for the stores and assets sold in 2010 were remitted to Katz Funding, either through its conduit Katz Funding (US), Inc., or as direct debt payments from New Snyder's, and applied on the CIT credit facility on the following dates and in the following amounts:

| Payor | On Behalf of | Amount | Date Funds Received by Katz Funding (US)[1] | Date Received by Katz Funding to CIT Line[2] |
|---|---|---|---|---|
| Walgreen's | New Snyder's | $4,000,000.00 | January 20, 2010 | January 21, 2010 |
| Walgreen's | New Snyder's | $15,400,000.00 | January 21, 2010 | January 26, 2010 |
| Walgreen's | New Snyder's | $4,183,878.63 | January 26, 2010 | January 31, 2010 |
| Walgreen's | New Snyder's | $5,262,839.90 | February 27, 2010 | February 25, 2010 ($2,500,000) February 28, 2010 ($3,579,975) March 31, 2010 ($1,662,840)[3] |
| Unknown | New Snyder's | $750,000.00 | | April 30, 2010 |
| Unknown | New Snyder's | $11,054.00 | | May 26, 2010 |
| Unknown | New Snyder's | $350,000.00 | | June 30, 2010 |
| Unknown | New Snyder's | $200,210.00 | | September 22, 2010 |
| Unknown | New Snyder's | $80,000.00 | | January 31, 2011 |
| Unknown | New Snyder's | $35,000.00 | | April 30, 2011 |

48.     Those transfers to Katz Funding made on behalf of New Snyder's listed in the chart above are hereinafter referred to as the "Post-Petition Transfers."

---

[1]   The dates in this column are determined from records produced by New Snyder's.

[2]   The dates in this column are determined from records produced by Katz Funding, and, on information and belief, the dates reflect application of funds.  Katz Funding may have received the funds earlier than the date identified in the chart.

[3]   For payments received by Katz Funding in February and March of 2010, there are discrepancies as between New Snyder's records and Katz Funding's records.

49.    On information and belief, there are no or very few creditors of New Snyder's other than those who would be deemed insiders, or those creditors of the Debtor who could have a claim under Minnesota law against New Snyder's as a successor entity of the Debtor.

## KATZ FUNDING'S EFFORTS TO EVADE MINNESOTA'S INSIDER FRAUDULENT TRANSFER PROVISIONS

50.    As noted above, when New Snyder's liquidated its remaining assets in 2010, the proceeds were paid to Katz Funding, an insider creditor of the Debtor, pursuant to New Snyder's guaranty of the CIT credit facility.

51.    MUFTA prohibits repayment of antecedent debt to an insider when that insider has reasonable cause to believe that the debtor is insolvent. Section 513.45(b) of MUFTA states that:

> [a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

52.    Katz Funding, through insider Daryl Katz, an affiliate of the Debtor, knew and had reasonable cause to believe that Debtor was insolvent prior to the Transfer and at the time of the Post-Petition Transfers.

53.    Katz sought to avoid the application of MUFTA's insider fraudulent transfer provisions by liquidating the Debtor through two separate transactions. The goal was to separate the distribution of the Debtor's assets from ultimate payee, Katz Funding, an insider creditor.

54.    Katz Funding availed itself of no potential defenses that could have arisen through court-supervised liquidation of the Debtor, or through compliance with the UCC. Instead, Katz Funding, controlled by the same individual who controlled the Debtor, sought to surreptitiously pay its insider claim to the detriment of those creditors MUFTA seeks to protect.

**THE TRUSTEE'S AVOIDANCE POWERS ARE SUPPLMENTED IN THIS CASE BY (1) NEW SNYDER'S STATUS AS A MERE CONDUIT; (2) THE UNIFIED PURPOSE OF THE TRANSFER AND POST-PETITION TRANSFERS; AND (3) THE GROUNDS TO SUBSTANTIVELY CONSOLIDATE THE DEBTOR AND NEW SNYDER'S**

55.     As pleaded below, Katz Funding may be liable as an initial transferee under 11 U.S.C. § 550(a) if the Court: (a) determines that New Snyder's is a mere conduit with respect to the Transferred Assets; (b) finds that the Transfer and the Post-Petition Transfers can be collapsed into a single transaction, or (c) substantively consolidates the Debtor and New Snyder's.

56.     New Snyder's was a mere conduit, as it did not have dominion or control over its assets, including the Transferred assets.  Rather, New Snyder's was controlled by insiders and affiliates of the Debtor (the transferor of the Transferred Assets), and Katz Funding (the ultimate transferee of the Transferred Assets), primarily Daryl Katz.

57.     The Transfer and the Post-Petition Transfers can be collapsed into a single transaction, such that the Trustee can avoid the transactions included in the defined Post-Petition Transfers as if they are part of the Transfer, based on the following factors, as well as those the Trustee may uncover in discovery:

     a.   All the parties involved had knowledge of the multiple transactions; and

     b.   Each transaction was part of an overall liquidation plan.

58.     The Court should substantively consolidate Debtor and New Snyder's for the limited purpose of providing the Trustee with standing to seek avoidance of any transfers purportedly made by New Snyder's, based on the following factors, as well as those the Trustee may uncover in discovery:

     a.   A unity of ownership between the two entities;

     b.   Inter-corporate guarantees on loans;

c.  Transfer of assets without formal observance of corporate formalities;

d.  The affairs of the entities are so entangled that consolidation will benefit the creditors;

e.  On information and belief, New Snyder's does not appear to have any existing creditors with substantial claims, other than insider and subordinated creditors, such as Katz Holdings and Katz Funding;

f.  The creditors of the Debtor will suffer greater injustice if the entities are not consolidated than the prejudice any party will suffer if the entities are consolidated;

g.  Katz Funding and other creditors essentially treated the Debtor and New Snyder's as a single borrowing entity; and

h.  Under Minnesota law, New Snyder's constituted a legal successor of the Debtor, presumably liable for the debts of the Debtor.

## TRUSTEE'S SPECIFIC CAUSES OF ACTION

### Count I: Avoidance of the Transfer pursuant to 11 U.S.C. § 548(a)(1)(A)

59.  Plaintiff realleges and incorporates by reference paragraphs 1 through 58.

60.  The Debtor made the Transfer to New Snyder's with the actual intent to hinder, delay, or defraud existing and future creditors, as evidenced by a confluence of a number of badges of fraud, including:

a.  The Debtor did not receive reasonably equivalent value in exchange for the Transfer;

b.  There was an insider relationship between New Snyder's and the Debtor as set forth in paragraphs 16 through 20 of this Complaint;

16

c. The Debtor was insolvent at the time of the Transfer, or became insolvent as a result of the Transfer;

d. The Debtor's senior secured creditor, CIT, had threatened to discontinue providing credit to the Debtor shortly before the Transfer;

e. According to the Debtor, the Transfer involved substantially all of the Debtor's purported valuable operating assets, and the Debtor liquidated its remaining assets shortly after the Transfer; and

f. The Transfer was an integral part of a liquidation plan advanced by the Debtor's controlling affiliate and an insider claimant, which such plan resulted in the payment of the proceeds of the Transferred Assets to an insider in circumvention of the Code's and MUFTA's insider fraudulent transfer provisions.

61. Therefore, the Transfer must be avoided under 11 U.S.C. § 548(a)(1)(A).

**Count II: Avoidance of the Transfer pursuant to 11 U.S.C. § 544(b)(1) and MINN. STAT. § 513.44(a)(1)**

62. Plaintiff realleges and incorporates by reference paragraphs 1 through 61.

63. The Debtor made the Transfer to New Snyder's with the actual intent to hinder, delay, or defraud existing and future creditors, as evidenced by a confluence of a number of badges of fraud, including:

a. The Debtor did not receive reasonably equivalent value in exchange for the Transfer;

b. There was an insider relationship between New Snyder's and the Debtor as set forth in paragraphs 16 through 20 of this Complaint;

c. The Debtor was insolvent at the time of the Transfer, or became insolvent as a result of the Transfer;

d. The Debtor's senior secured creditor, CIT, had threatened to discontinue providing credit to the Debtor shortly before the Transfer;

e. According to the Debtor, the Transfer involved substantially all of the Debtor's purported valuable operating assets, and the Debtor liquidated its remaining assets shortly after the Transfer; and

f. The Transfer was an integral part of a liquidation plan advanced by the Debtor's controlling affiliate and an insider claimant, which such plan resulted in the payment of the proceeds of the Transferred Assets to an insider in circumvention of the Code's and MUFTA's insider fraudulent transfer provisions.

64. Therefore, the Transfer must be avoided under MINN. STAT. §§ 513.44(a)(1) and 513.47.

65. The Trustee has standing to avoid such Transfer under 11 U.S.C. § 544(b)(1), as at the time of the Transfer there were present and future creditors who presently hold unsecured claims against the Debtor that are allowable under 11 U.S.C. § 502 or are not allowable only under 11 U.S.C. § 502(e).

### Count III: Avoidance of the Transfer pursuant to 11 U.S.C. § 548(a)(2)(B)

66. Plaintiff re-alleges paragraphs 1 through 65.

67. The Debtor made the Transfer to New Snyder's for less than reasonably equivalent value in exchange, and:

18

a.  the Debtor was insolvent on the date that such Transfer was made, or became insolvent as a result of such Transfer;

b.  the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital;

c.  the Debtor intended to incur debts that would be beyond the Debtor's ability to pay as such debts matured; or

d.  the Debtor made such Transfer to an insider, as is described in Paragraphs 16 through 20 of this Complaint.

68.   Therefore, the Transfer must be avoided under 11 U.S.C. § 548(a)(1)(B).

## Count IV: Avoidance of the Transfer pursuant to 11 U.S.C. § 544(b)(1) and Minn. Stat. § 513.44(a)(2)(ii)

69.   Plaintiff realleges paragraphs 1 through 68.

70.   The Debtor made the Transfer to New Snyder's for less than reasonably equivalent value in exchange and:

a.  the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any assets remaining with the Debtor were unreasonably small; or

b.  the Debtor intended to incur debts that would be beyond the Debtor's ability to pay as they became due.

71.   Therefore, the Transfer must be avoided under Minn. Stat. §§ 513.44(a)(2) and 513.47.

72.   The Trustee has standing to avoid such Transfer under 11 U.S.C. § 544(b)(1), as at the time of the Transfer there were present and future creditors who presently hold unsecured

claims against the Debtor that are allowable under 11 U.S.C. § 502 or are not allowable only under 11 U.S.C. § 502(e).

## Count V: Avoidance of the Transfer pursuant to 11 U.S.C. § 544(b)(1) and Minn. Stat. § 513.45(a)

73.     Plaintiff realleges paragraphs 1 through 72.

74.     The Debtor made the Transfer to New Snyder's for less than reasonably equivalent value and the Debtor was insolvent at the time of the Transfer or became insolvent as a result of the Transfer.

75.     Therefore, the Transfer must be avoided under Minn. Stat. §§ 513.45(a) and 513.47.

76.     The Trustee has standing to avoid such Transfer pursuant to 11 U.S.C. § 544(b)(1) as at the time of the Transfer there were present creditors who presently hold unsecured claims against the Debtor that are allowable under 11 U.S.C. § 502 or are not allowable only under 11 U.S.C. § 502(e).

## Count VI: Avoidance of the Transfer pursuant to 11 U.S.C. § 544(b) and Minn. Stat. § 513.45(b)

77.     Plaintiff realleges paragraphs 1 through 76.

78.     The Debtor made the Transfer to New Snyder's, and ultimately to Katz Funding, an insider of the Debtor, for payment of an antecedent debt claimed by Katz Funding, at a time when the Debtor was insolvent, and when Katz Funding had reasonable cause to believe that the Debtor was insolvent.

79.     Therefore, the Transfer must be avoided under Minn. Stat. §§ 513.45(b) and 513.47.

20

80.     The Trustee has standing to avoid such Transfer pursuant to 11 U.S.C. § 544(b)(1) as at the time of the Transfer there were present creditors who presently hold unsecured claims against the Debtor that are allowable under 11 U.S.C. § 502 or are not allowable only under 11 U.S.C. § 502(e).

### Count VII: Recovery of the Transferred Assets pursuant to 11 U.S.C. § 550(a)

81.     Plaintiff realleges paragraphs 1 through 80.

82.     The Transfer should be avoided pursuant to Counts I through VI.

83.     Katz Funding received the proceeds of the Transferred Assets less than a year after the Transfer through the Post-Petition Transfers.

84.     Katz Funding is liable as the initial transferee of such Transferred Assets or the party for whose benefit such Transfer was made.

85.     If Katz is not deemed the initial transferee, or the entity for whose benefit such Transfer was made, Katz Funding is liable as an immediate or mediate transferee of the Transferred Assets, who did not receive the proceeds of the Transfer for value, in good faith, or without knowledge of the avoidability of the Transfer.

86.     In either instance described in the two preceding paragraphs, the Trustee is entitled to recover from Katz Funding the Transferred Assets or their proceeds, or is entitled to a money judgment against Katz Funding for the value of the Transferred Assets.

87.     Alternatively if Katz Funding is not the initial transferee, New Snyder's is liable either as initial, immediate or mediate transferee under 11 U.S.C. § 550(a), and the Trustee is entitled to recover from New Snyder's the Transferred Assets or their proceeds, or is entitled to a money judgment against New Snyder's for the value of the Transferred Assets.

## Count VIII: Avoidance of the Transfer pursuant to 11 U.S.C. § 549 and Recovery of the Transfer pursuant to 11 U.S.C. § 550(a).

88.     Plaintiff realleges paragraphs 1 through 87.

89.     New Snyder's is a mere conduit of the Debtor.

90.     The Transfer and the Post-Petition Transfers are part of a single, integrated transaction which was not complete until the final transaction identified in the Post-Petition Transfers.

91.     Sufficient factors exist to substantively consolidate the Debtor and New Snyder's for the limited purpose of providing the Trustee with standing to seek avoidance of any transfers purportedly made by New Snyder's.

92.     Based on any one of the allegations listed in the three preceding paragraphs, Trustee would have standing to avoid the Post-Petition Transfers which were completed or took place after the commencement of the Debtor's involuntary bankruptcy on December 3, 2009, and after the Order for Relief entered on December 29, 2009.

93.     The Post-Petition Transfers were made after the commencement of this case and the Order for Relief, and were not authorized by this Court.

94.     Such Post-Petition Transfers are therefore avoidable pursuant to 11 U.S.C. § 549(d).

95.     Pursuant to 11 U.S.C. § 550(a)(1), Katz Funding is an initial transferee of such Transferred Assets, and the Trustee is entitled to recover from Katz Funding the Transferred Assets or their proceeds, or is entitled to a money judgment against Katz Funding for the value of the Transferred Assets.

96.     To the extent that Katz Funding could be deemed an immediate or mediate transferee of the Transferred Assets, it did not receive the Transfers for value, in good faith, or

without knowledge of the avoidability of the transfer avoided, and the Trustee is entitled to recover from Katz Funding the Transferred Assets or their proceeds, or is entitled to a money judgment against Katz Funding for the value of the Transferred Assets.

### Count IX: Avoidance of Katz Funding's Secured Claim pursuant to 11 U.S.C. § 544(a)

97.     Plaintiff realleges paragraphs 1 through 96.

98.     Katz Funding has filed a secured claim, which it claims attaches to most, if not all, of the assets of the Estate.

99.     None of the assets of the Estate are presently subject to any secured claim of Katz Funding.

100.    Katz Funding asserts a secured claim pursuant to its position on the CIT credit facility, the security agreements and the financing statements CIT executed and filed as administrator of the CIT credit facility.

101.    The change of the Debtor's name on April 6, 2009 from Snyder's Drug Stores, Inc. to E151 Minnesota, Inc. rendered any prior UCC filings by CIT and / or Katz Funding against Snyder's Drug Stores, Inc., to be seriously misleading under MINN. STAT. §§ 336.9-506(b), (c) and 503(a).

102.    Pursuant to MINN. STAT. § 336.9-507(c), where a change to the debtor's name renders a prior financing statement seriously misleading, the prior financing statement perfects an interest only in that collateral obtained by the debtor prior to the name change, and such collateral acquired by the debtor within four months after the name change. The secured party can only perfect its interest in collateral acquired beyond four months after the name change by filing an amendment within four months after the name change which identifies the new identity of the debtor so that the prior financing statement is no longer seriously misleading.

103.    A UCC search describing the Debtor by the term "E151 Minnesota" does not reveal a filed financing statement by Katz Funding, or CIT.  Neither CIT, nor Katz Funding, timely filed an amended financing statement to preserve a secured claim against the Debtor's personal property.

104.    Katz Funding cannot claim any lien against property of the debtor acquired after August 6, 2009.  Trustee believes that most, if not all, property of the estate was acquired by the Debtor after that date, and that other items of property listed below were not subject to Katz Funding's security interest in the first instance.

105.    The Trustee received a tax refund in 2010 attributable to payroll taxes paid in the third quarter of 2009.  Debtor obtained any such interest in those tax refunds as a general intangible no earlier than the end of the third quarter of 2009, and in any event after Katz Funding's security interest became unperfected on August 6, 2009.

106.    Trustee recovered rents and proceeds on account of Debtor's subleases on parcels of real property leased by Debtor.  The Debtor's and the Estate's interests in the subleases or any rents derived thereof are not subject to any security interest claimed by Katz Funding pursuant to MINN. STAT. § 336.9-102(13), which provides that the UCC does not cover interests in real property or rents derived thereof.  Further, on information and belief, the rents collected by the Estate were all paid after August 6, 2009, and therefore Katz Funding's expired lien did not attach to any such rents.

107.    On the Petition Date, Debtor had certain cash in deposit accounts, which, on information and belief, were proceeds of the real estate subleases, or payments to which the Debtor acquired rights in after August 6, 2009.  Further, Katz Funding did not have control of the deposit accounts, nor entered into a deposit account control agreement signed with the depository

24

institution holding the deposit account.  Therefore, Katz Funding had no perfected lien against such deposit accounts.

108.    Trustee has received proceeds through the sale of the Estate's rights in a potential class action claim.  The claim is based on various federal statutory claims of unlawful trade practice and anticompetitive behavior by issuers of credit and debit cards related to the interchange rates charged on all such transactions.  The Estate's assets traceable to the Debtor's cause of action based on such federal statutory violations are proceeds of a commercial tort claim under MINN. STAT. § 336.9-102(13).

109.    Trustee has received proceeds from a bond policy payable on account of an employee's theft of the Debtor's property.  The surety agreed to pay moneys to the Estate once the Estate has assigned its tort claim against the employee who converted the Debtor's property. The Estate's assets traceable to this recovery are proceeds of a commercial tort claim under MINN. STAT. § 336.9-102(13).

110.    Such commercial tort claims are not described with specificity in the security agreements under the CIT credit facility under which Katz Funding claims a lien, and therefore Katz Funding has no security interest in such claims or their proceeds.

111.    Based on the above, Trustee believes that Katz Funding's claim is substantially, if not entirely, unsecured.

112.    Section 544(a) of the Code, referred to as the "strong arm clause", gives the Chapter 7 Trustee the rights and powers of (1) a creditor on a simple contract with a judicial lien on the debtor's property as of the date of the petition; (2) a creditor with a writ of execution against the property of the debtor that is unsatisfied as of the date of the petition; and (3) a *bona fide* purchaser of the debtor's real property as of the date of the petition.

25

113.   Trustee has standing under 544(a) of the Code to avoid any security interest claimed by Katz Funding against the assets of the Estate.

114.   The Court should avoid any secured claim asserted by Katz Funding.

**Count X: Equitable Subordination of Katz Funding Claim under 11 U.S.C. § 510**

115.   Plaintiff realleges and incorporates by reference paragraphs 1 through 114.

116.   Katz Funding steered the Debtor through liquidation in a fashion that enhanced its recovery at the expense of the general unsecured creditors.

117.   Katz Funding sought to perpetrate a fraud upon the general unsecured creditors of the Debtor.

118.   Katz Funding engaged in inequitable conduct.

119.   The claims of other Katz-related entities were generally subordinated to other outside creditors.

120.   Katz Funding overleveraged the Debtor by characterizing Katz Funding's risk capital as debt.

121.   The misconduct resulted in substantial injury to the creditors of the Debtor and conferred an unfair advantage on Katz Funding.

122.   Equitable subordination of Katz Funding's claim is not inconsistent with the provisions of the Code.

123.   Thus, Katz Funding, as an insider, has engaged in inequitable conduct sufficient to warrant the equitable subordination of its claim under 11 U.S.C. § 510 to that of the claims of all other claimants of the Estate.

**Count XI: Re-Characterization of Katz Funding Claim**

124.   Plaintiff realleges paragraphs 1 through 123.

125.    Moreover, the Court should re-characterize the claim of Katz Funding as equity.

126.    Debtor was not sufficiently capitalized with equity investments.

127.    In Daryl Katz, there is identity of the Debtor's controlling party and the controlling party of Katz Funding, Debtor's creditor.

128.    The claims of other Katz-related entities were generally subordinated to other outside creditors.

129.    As a result, the Court should re-characterize the Katz Funding claim as equity.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

1.    Avoiding of the Transfer (or Post-Petition Transfers where appropriate) pursuant to 11 U.S.C. §§ 544, 548, and 549, as well as under those applicable provisions of MUFTA cited herein;

2.    In the alternative under 11 U.S.C. § 550(a):

    a.    Requiring return of the Transferred Assets or their proceeds by Defendants New Snyder's or Katz Funding, where possible; or

    b.    Awarding Trustee judgment against Defendants New Snyder's and Katz Funding, jointly and severally, for the value of Transferred Assets.

3.    Finding that Katz Funding does not hold a secured claim against the Estate assets.

4.    Equitably subordinating Katz Funding's claim, or re-characterizing Katz Funding's claim as equity.

5.    Awarding judgment in favor of Trustee and against Defendants, jointly and severally, for taxable costs and disbursements.

6.    For such other relief as this Court deems appropriate.

Dated: December 27, 2011          MACKALL, CROUNSE & MOORE, PLC


/e/ Mychal A. Bruggeman
Timothy D. Moratzka (#75036)
Mychal A. Bruggeman (#345489)
1400 AT&T Tower
901 Marquette Ave
Minneapolis, MN 55402
(612) 305-1400

ATTORNEYS FOR TRUSTEE

2236105.3-MAB